Filed 3/30/16  P. v. Velasquez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069290 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB1400215) |
| VINCENT RICARDO VELASQUEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Victor R. Stull, Judge.  Affirmed.

Alan S. Yockelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Scott C. Taylor and Charles C. Ragland, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Vincent Ricardo Velasquez of forcible rape in concert (Pen. Code, § 264.1, subd. (a); count 1; further undesignated statutory references are to the Pen. Code) and forcible oral copulation in concert (§ 288a, subd. (d)(1); count 2), and in a bifurcated proceeding following the verdict, the trial court found true the allegations that Velasquez had convictions resulting in two prior strikes (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)), two prior serious felonies (§ 667, subd. (a)(1)) and four prior prison terms (§ 667.5, subd. (b)).

The trial court sentenced Velasquez to prison for a determinate term of 17 years on count 2 and an indeterminate term of 39 years to life on count 1 and imposed certain fines and fees.

On appeal, Velasquez raises five issues, contending that the trial court erred: (1) in admitting into evidence a photograph of Velasquez that showed the front of his tattooed body from the waist to the head; (2) in failing to instruct the jury sua sponte on unanimity; (3) in failing to instruct the jury sua sponte on a lesser included offense; (4) in failing to vacate Velasquez's two prior convictions for gang participation or, alternatively, in failing to dismiss the allegation of those convictions at the time of sentencing; and (5) in calculating the total prison sentence. None provides a basis on which to reverse; accordingly, we affirm the judgment.

## I.

## FACTUAL BACKGROUND

We review the record and recite the facts in a light most favorable to the judgment. (*People v. Hill* (1998) 17 Cal.4th 800, 848-849.) Where, in the discussion of certain

issues on appeal, Velasquez is entitled to our consideration of other evidence, we will set forth in that discussion the additional issue-specific evidence.

On the night of January 10, 2014 (all subsequent dates are in the year 2014), the family with which Jane Doe was living[1] hosted a small gathering. Around 11:00 or 11:30 p.m., Velasquez, his younger brother Brian Jamerson and his friend Jesse Sandoval arrived at the get-together. Doe had not met any of them before, although Sandoval was a friend of Doe's boyfriend, who was incarcerated, and Sandoval had contacted Doe about the boyfriend and the two of them (Sandoval and Doe) had exchanged Facebook messages. Sandoval recognized Doe, introduced himself, and the two of them talked for an hour or so. Around 12:30 a.m. on January 11, at Sandoval's request, Doe gave Sandoval, Velasquez and Jamerson a ride to the house of Cecilia Jeminte, the mother of Velasquez and Jamerson.

When they arrived at Jeminte's house, Jeminte opened the door for everyone, and Doe went to use the bathroom. On her way out, Doe walked into the bedroom where the three men had gone to say good night to them. The room was small, approximately eight feet by 12 feet, with a couch and a mattress. Jamerson was just leaving, and once Doe entered the bedroom Sandoval closed the door with Doe, Velasquez and Sandoval inside. The door did not have a knob or lock, and Velasquez placed an air tank next to the inside of the door as he and Sandoval asked her to stay. Doe told them that she had to go home

---

[1]    At one point, Doe testified that the family was that of her ex-boyfriend. At other points, Doe referred to him as a current boyfriend. The status of Doe's relationship with the friend is irrelevant to the issues on appeal. For convenience, we will refer to him as a current boyfriend.

3

because her roommate was expecting her and she had plans to go to church in the morning, but Sandoval moved closer to her and told her she was going to stay.

At this point, Doe became scared sitting on the couch; she testified that "little alarms started going off." Sandoval sat down next to Doe and began kissing her, putting his hands up her shirt and taking off her bra. Doe told Sandoval "no," explained that she had to go and then asked him to please let her leave; but that only made him more determined to keep her there, and he began pulling off her pants. Meanwhile, Sandoval was naked, and Velasquez began taking off his clothes. Seeing what she described as the "scary" tattoos on Velasquez's naked body, Doe became even more afraid.

Sandoval removed the remainder of Doe's clothing, forced her to lay on her back on the arm of the couch and have sexual intercourse with him. Doe again told Sandoval "no" and again asked to leave, but Sandoval continued with the intercourse.

Velasquez approached Doe, pulled down his boxer shorts and told Doe, "suck my dick." When Doe tried to push Velasquez away and again said "no" and that she wanted to go home, Sandoval told her not to say "no" to his "homie" and to do what his "homie" said or the situation "was gonna be worse" for her. Doe then put down her arm, at which time Velasquez grabbed the back of her head, turned it sideways to face him and forced her to orally copulate him — all the while being vaginally penetrated by Sandoval.

This continued for hours, although at some point Sandoval withdrew long enough for the two men to guide Doe to the mattress. Velasquez continued to force the oral copulation even during the move. When Sandoval withdrew, Doe was crying and again asked to leave.

4

Once on the mattress, the men continued to penetrate Doe — Sandoval vaginally and Velasquez orally. The men compelled Doe to participate in nonconsensual, nonstop sex for four hours, physically pushing her into different positions. Although the positions changed, for the most part Sandoval was forcing his penis into Doe's vagina, and Velasquez was forcing his penis into Doe's mouth. Both men ejaculated "a few times" over the course of the ordeal — Sandoval three times and Velasquez at least once.

Sandoval generally told Doe what to do, and if she did not respond promptly, he punched her with a closed fist or slapped her — all the while encouraging Velasquez to participate more fully. Likewise, Velasquez caused Doe physical pain by constantly pulling her head forcefully into his pelvis during the oral copulation. In addition, Sandoval verbally demeaned and degraded Doe. Doe explained that she did not scream for help, because at one point — and the record is unclear as to exactly when — Sandoval told Doe to "be quiet and not to yell" or else he and Velasquez would "hurt" her. Doe believed the threat.

According to Doe, shortly before the events concluded, Sandoval stuck his fingers in her anus. He removed them (covered with feces) and ordered Doe to clean them. She wiped them with a sock on the floor, but Sandoval was not satisfied and stuck his fingers in Doe's mouth, causing her to vomit.

Leading up to the final acts, Sandoval ejaculated in or around Doe's vagina and proceeded to watch as Velasquez continued forcing Doe to orally copulate him until he ejaculated. Sandoval then ordered Doe to turn around in order for her to orally copulate

5

him while Velasquez had intercourse from behind. Although Velasquez had difficulty regaining an erection, he nonetheless penetrated her vagina with his penis.

Meanwhile, Sandoval had finished and gotten dressed. When Velasquez finished, Doe asked the men whether she could put on her clothes, but Sandoval said no. After Sandoval left the bedroom, Velasquez told Doe she could get dressed. Doe put on her pants and sweatshirt, but did not take time to look for her bra, underpants or socks. The keys to Doe's truck were not where she left them. Wanting only to leave, Doe told Velasquez that she did not care about the car and could walk home, but as she headed toward the bedroom door, Velasquez grabbed her by the shoulders and threatened, "I'm not sure if I'm done fucking you yet." Doe was crying and begging Velasquez to let her go home, and he allowed her to leave the room and the house.

Not seeing her truck on the street where she had left it hours earlier, Doe just began walking away. Fearful that Sandoval might return, see her on the sidewalk and further detain her, Doe began to run — all the way to where her adult son and ex-husband lived, which was approximately five blocks away. Ten minutes later, Doe arrived at their house in shock and collapsed after knocking on a window.

Doe's son and ex-husband found her in front of their house, behind a bench, in the fetal position crying around 5:00 a.m. As she was attempting to tell them that she had been raped, she suffered an asthma attack. Doe's son quickly got an inhaler and medicine from his father and treated Doe. Once she was able to breathe again, her son tried to convince her to call the police, but she would not because she was too scared. After

6

letting Doe cry for a while, her son took her to the house of her boyfriend's family where she had been staying.

Later in the day on January 11, after showering Doe went to a hospital to report the rape and be examined. The medical staff gave Doe medication for pain and anxiety and performed a basic examination. After the police arrived, they took her to a different hospital where a nurse performed an examination with a rape kit. The nurse who examined Doe noted several tears to her anal verge (where Doe said Sandoval had penetrated her); tenderness on the bridge of her nose (where Doe said Velasquez had forced her head into his pelvis); bruises on her upper arms (where Doe said Sandoval had held her); and abrasions on the sides of her body between her ribs and hips (where Doe said Sandoval had hit her). Although the vaginal examination did not disclose any physical injuries, the nurse confirmed multiple times that the lack of a noticeable injury to the vagina did not rule out vaginal rape.

Police officers went to Jeminte's house to detain possible suspects based on Doe's description of events from early that morning. As the officers were talking to Jeminte at the front door, Velasquez and another man fled from the house; they ran through yards and jumped over five or six fences as the officers and their back-ups chased them. The police caught the two suspects and arrested Velasquez.[2] Other officers, who had obtained a warrant, searched Jeminte's house and took with them, among other items, underpants and a bra that officers believed belonged to Doe.

---

2    At trial, the People presented evidence that Sandoval was still at large.

7

At the beginning of the police interview, Velasquez denied knowing Doe. By the end of the interview, Velasquez admitted receiving oral sex from and having vaginal intercourse with Doe — initially explaining that Doe had invited him to have sex, then changing his story to an invitation from Sandoval to join him (Sandoval) and Doe.

II.

PROCEDURAL BACKGROUND

In early February, the People filed an information against Velasquez, alleging the following four counts: (1) forcible rape in concert, in violation of section 264.1, subdivision (a); (2) forcible oral copulation in concert, in violation of section 288a, subdivision (d)(1); (3) forcible sexual penetration in concert, in violation of section 264.1, subdivision (a); and (4) forcible sodomy in concert, in violation of section 286, subdivision (d)(1). The information alleged a number of prior strikes (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)), prior serious or violent felony convictions (§ 667, subd. (a)(1)), and prior prison terms (§ 667.5, subd. (b)).

Following trial, the jury found Velasquez guilty on count 1 (forcible rape in concert) and count 2 (forcible oral copulation in concert) and not guilty on count 3 (forcible sexual penetration in concert) and count 4 (forcible sodomy in concert). The trial court found true the allegations that Velasquez had convictions resulting in two prior strikes, two prior serious felonies and four prior prison terms.

In posttrial proceedings, the court denied a new trial, declined to set aside or invalidate the prior (strike) convictions for gang participation (§ 186.22, subd. (a)), and struck the two prior strike convictions as to count 2 (forcible oral copulation in concert).

8

The court sentenced Velasquez to a determinate term of 17 years on count 2 and a consecutive indeterminate term of 39 years to life on count 1, calculated credits and imposed a fine. Defendant timely appealed.

III.

DISCUSSION

Velasquez raises five major issues on appeal. The first three concern events during the trial, and the final occurred in posttrial proceedings. We find no reversible error.

A. *The Court Did Not Err in Admitting Into Evidence the Photograph of Velasquez*

Velasquez argues that the trial court erred in admitting into evidence a photograph of him from the waist up in which he is shirtless and his tattoos are plainly visible. Velasquez contends the photograph is irrelevant and whatever probative value it might have had was outweighed by its prejudicial effect. The People respond by arguing that the court did not abuse its discretion in admitting the photograph into evidence.

The court did not err in admitting the photograph into evidence.

1. *Additional Background*

The evidence at issue, trial exhibit No. 1, is an eight-inch by 10-inch color photograph of the frontal view of Velasquez which the prosecutor represented to the trial court was taken within 24 hours of the events of January 11. The photograph is of Velasquez standing with his hands at his sides and from the bottom to the top shows from his finger tips to the top of his head. Velasquez is shirtless, and from what can be seen of the front of his arms, chest, neck and face, tattoos cover almost the entirety of his upper

9

body (with the exception of a small area on his right shoulder and a small area around his cheeks and nose). The illustrations include women's faces, numerous letters of the alphabet,[3] a hooded figure, the grim reaper (including the scythe) and various intricate scenes and designs.

To prove the charges of rape in concert (count 1), the People were required to establish that the perpetrator accomplished the sexual intercourse by "force, violence, duress, menace, or fear of immediate and unlawful bodily injury." (§ 261, subd. (a)(2).) To prove the charges of oral copulation in concert (count 2), the People were required to establish that the perpetrator committed an act of oral copulation by "force or fear of immediate and unlawful bodily injury." (§ 288a, subd. (d)(1).) In pretrial proceedings, the People brought a motion in limine to allow the photograph to be admitted into evidence. The People argued that, because they had the burden of proving that Doe was actually and reasonably in fear of Velasquez, they wanted to let the jury see and understand what Doe faced when Velasquez confronted her in the bedroom on January 11. In response to Velasquez's argument that the photograph would prejudicially suggest gang membership, the prosecutor agreed to a limiting instruction, if necessary, in which the jury would be told that it could consider the photograph only with regard to Doe's state of mind. The court deferred ruling until it could hear Doe's trial testimony regarding her fear.

---

3       The only discernable word is "Cecilia."

10

At trial, Doe testified that she first became scared after Velasquez placed the air tank next to the bedroom door to keep the door from opening. She became even more afraid as Velasquez undressed and she saw the "scary" tattoos on Velasquez's naked body. The prosecutor then asked the court's permission to show the photograph to Doe. In a sidebar conference, Velasquez's attorney objected on the basis the photograph was irrelevant and its prejudicial effect outweighed any probative value. The court ruled that (1) because Doe's fear was relevant, evidence of what contributed to her fear was relevant, and (2) because Doe testified Velasquez's tattoos elevated her fear, the People were entitled to present visual evidence of what she said caused the additional fear. The court also ruled that, on balance, the evidence of the tattoos was more probative than prejudicial given the issue of Doe's fear and, thus, her purported consent to the sexual advances as asserted by Velasquez.

Finally, days later when the People asked that the photograph be admitted into evidence, Velasquez's counsel again objected. Commenting that it had previously ruled that the photograph was admissible, the court overruled the objection.

2. *Law*

Velasquez argues that the trial court erred in admitting the photograph into evidence on two grounds: (1) the photograph was not relevant; and if relevant, (2) the prejudicial effect of the admission of the evidence outweighed any probative value.

Under Evidence Code sections 350 and 351, respectively, "[n]o evidence is admissible except relevant evidence[,]" and "all relevant evidence is admissible." In this regard, "relevant evidence" means "evidence, including evidence relevant to the

11

credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)  Under Evidence Code section 352, the trial court may exclude otherwise relevant evidence "if its probative value is substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Because a trial court has "*wide discretion* in assessing whether in a given case a particular piece of evidence is relevant and whether it is more prejudicial than probative," we review the court's decision under these standards for an abuse of discretion.  (*People v. Duff* (2014) 58 Cal.4th 527, 558, italics added.)  A court abuses its discretion in this context only where the appellant establishes that, by its ruling, the court acted "in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113.)

3.      *Analysis*

a.      *Relevance (Evid. Code, §§ 350, 351)*

Velasquez argues first that the photograph was not relevant to "any issue at trial" (capitalization omitted), discussing what he characterizes as "[t]he primary issue" of Doe's consent.  We assume that the defense of consent includes the issue whether Velasquez engaged Doe in sexual intercourse or oral copulation by fear.

Doe first became afraid when Velasquez moved the air tank next to the door so that it would not open.  The next mention of fear by Doe was when Velasquez undressed. In particular, Doe testified that the tattoos on Velasquez's naked body made her "more

12

afraid" because they were so "scary." Given that testimony and the People's burden of proving forcible rape and forcible oral copulation, the evidence of Velasquez's tattoos was relevant.

Accordingly, in ruling that photograph was relevant to the issue of Doe's fear — both its existence and reasonableness — the trial court did not act in an arbitrary, capricious or absurd manner and, thus, did not abuse its discretion in determining relevance.

b.       *More Probative Than Prejudicial (Evid. Code, § 352)*

Under Evidence Code section 352, the trial court must balance the probative value of the proffered evidence against the potential prejudice should the evidence be admitted. (*People v. Soper* (2009) 45 Cal.4th 759, 779, fn. 16.) " 'The chief elements of probative value are relevance, materiality and necessity. [¶] Before permitting the jury to [receive the challenged] evidence . . . the court must ascertain that the evidence (a) "tends logically, naturally and by reasonable inference" to prove the issue upon which it is offered; (b) is offered upon an issue which will ultimately prove to be material to the People's case; and (c) is not merely cumulative with respect to other evidence which the People may use to prove the same issue.' " (*People v. Lang* (1989) 49 Cal.3d 991, 1049 (conc. & dis. opn. of Mosk, J.), abrogated on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176.) In contrast, "the chief element of prejudice is the potential to lead a jury to convict the defendant because of his bad character or record and not on the basis of his conduct." (*Lang*, at p. 1049.)

Given the foregoing standard and our discussion in part III.A.3.a., *ante*, the trial court did not abuse its discretion in determining that the photograph had probative value: it tended to prove Doe's fear (both its existence and reasonableness), an issue material to the People's case, and was not cumulative. Indeed, given the issues of consent and fear, the evidence of Velasquez's appearance at the time he engaged in sex with Doe was highly probative.

Velasquez's attempt to distinguish this case from *People v. Thomas* (2011) 51 Cal.4th 449 (*Thomas*) is not persuasive. For purposes of this argument, we accept Velasquez's premise that evidence of a defendant's gang membership must be " 'carefully scrutinized by trial courts' " so as to avoid the jury's inference that a gang member has a criminal disposition. (Quoting *People v. Carter* (2003) 30 Cal.4th 1166, 1194.) In *Thomas*, an appeal following a conviction for rape and murder, the trial court had admitted into evidence several photographs of the defendant's tattoos that the defendant contended established a gang connection. (*Thomas*, at p. 488.) Under facts similar to those here, the Supreme Court concluded that the trial court did not abuse its discretion in ruling that, because of the issue of consent to the sexual intercourse, the photographs by themselves (i.e., without evidence connecting them to gang membership) were not inherently prejudicial. (*Ibid.*) Velasquez tries to distinguish *Thomas* on the basis that the the defendant in *Thomas* had no prior relationship with the victim, whereas here Doe knew Velasquez. We fail to see any true distinction, since Doe had met Velasquez only

14

hours before the events and did not really know him. Otherwise, *Thomas* is directly on point and controlling.[4]

For the first time on appeal, Velasquez objects to what his appellate attorney describes as "the most prominent tattoo in the photograph[, which] states 'Westside' across [Velasquez's] abdomen" and argues that, because *Jamerson* belonged to a gang called "West Side Verdugo," the jury could infer that *Velasquez* was also an active member in the gang. We are not convinced.

First, by not presenting any argument to the trial court based on the purported meaning of the specific tattoo — thereby giving the trial court the opportunity to consider this argument in ruling on the admissibility of the photograph (*People v. De Soto* (1997) 54 Cal.App.4th 1, 10) — Velasquez forfeited appellate review of the issue. (*People v. Wash* (1993) 6 Cal.4th 215, 244.) Second, contrary to Velasquez's description of the tattoo in his opening brief — i.e., "the very large gang tattoo across [Velasquez's] abdomen" — the photograph only shows the letters "ESTSID" (and, in fact the "D" looks more like an "O," resulting in "ESTSIO"), which is distinctly different than Jamerson's testimony regarding his membership in the "West Side Verdugo" gang. Finally, at the

---

4       We note that, in *Thomas*, the trial court instructed the jury that the photographs
" 'can only be used on the issue of consent. In other words, what [the victim] actually
could see on the day in question. You cannot use it for any other issue or purpose other
than the issue of consent.' " (*Thomas*, *supra*, 51 Cal.4th at p. 488.) Here, the prosecutor
agreed to — in fact, suggested — the same limiting instruction. If Velasquez had the
same concern at trial that he expresses on appeal, he could have requested a similar
instruction. Having failed to do so, he cannot complain about the lack of an instruction
(*People v. Cowan* (2010) 50 Cal.4th 401, 480) and is left only with a prejudice argument
that likely could have been avoided altogether by a limiting instruction.

time the trial court was balancing probative value and prejudicial effect (while Doe was on the witness stand), the evidence from Jamerson regarding his gang membership had not been presented, and Velasquez's counsel did not advise the court that such evidence might be forthcoming.

In any event, even if we consider the events after the court overruled Velasquez's evidentiary objection, Velasquez cannot establish prejudice — i.e., what he suggests may have been the jury's erroneous inference that the tattoo was gang-related. First, there is no indication anywhere in the record that the jury considered, let alone determined, whether Velasquez was a gang member at the time of the charged offenses. Second, *Velasquez's attorney* — not the prosecutor — presented the evidence Velasquez contends might have associated him with a gang. Velasquez's attorney called Jamerson as a witness and asked him about his gang affiliation, including the name of the gang and his related tattoos. Even after that introduction of gang evidence on direct examination, the prosecutor only asked Jamerson six questions, none of which had anything to do with Velasquez's photograph, gang membership or tattoos. Additionally, Velasquez's attorney first asked Velasquez about his prior gang affiliation and two prior convictions for associating with a criminal street gang. Although the prosecutor confirmed the two convictions on cross-examination, he did not ask any other gang-related questions. Finally, the prosecutor did not mention anything gang-related in his closing argument or rebuttal.

16

Accordingly, in ruling that the probative value of the photograph outweighed any chance of undue prejudice, the trial court did not act in an arbitrary, capricious or absurd manner and, thus, did not abuse its discretion.

c. *Conclusion*

Because the trial court did not abuse its discretion in ruling both that the photograph was relevant and that its probative value outweighed any potential prejudice, the trial court did not err in admitting the photograph into evidence.

B. *The Trial Court Did Not Err in Failing to Instruct the Jury on Unanimity*

Velasquez argues that, because the evidence could have supported "two discreet rape in concert offenses" — one with Velasquez as principal and one with Sandoval as principal — the trial court erred in failing to instruct the jury that it had to agree unanimously on which act they relied in finding Velasquez guilty of rape in concert. The People counter by arguing that a unanimity instruction was not required because the jury did not have to agree on whether Velasquez was the principal or an aider and abettor in the rape in concert charge.

The trial court did not err in failing to instruct the jury on unanimity.

1. *Additional Background*

In count 1, Velasquez was charged with violating Section 264.1, subdivision (a), which criminalizes as rape in concert "any case in which the defendant, voluntarily acting in concert with another person, by force or violence and against the will of the victim, commit[s] an act described in Section 261, 262, or 289, either personally or by aiding and abetting the other person." As applicable here, section 261, subdivision (a)(2) defines

17

"[r]ape" as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator" "[w]here it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another."

Based on CALCRIM No. 1001, the court instructed the jury in part as follows:

"To prove that [Velasquez] is guilty of [rape in concert,] the People must prove that: (1) [Velasquez] personally committed forcible rape and voluntarily acted with someone else who aided and abetted its commission. Or, (2) [Velasquez] voluntarily aided and abetted someone else who personally committed forcible rape."

Given this instruction and the evidence introduced at trial, the People argued to the jury *both* that Sandoval aided and abetted Velasquez as the principal *and* that Velasquez aided and abetted Sandoval as the principal.

In defense to the evidence that Velasquez was the principal, Velasquez argued to the jury both (1) that, because he did not penetrate Doe vaginally, he did not commit rape, and (2) that Doe voluntarily participated in (i.e., consented to) to the intercourse. In support of the first argument, the record contains evidence that, at the time Velasquez attempted sexual intercourse with Doe, he did not have an erection; he merely rubbed his penis on the outside of her vagina; he did not penetrate her; and he did not ejaculate.

In defense to the evidence that Velasquez aided and abetted Sandoval as the principal, Velasquez argued to the jury that, because he reasonably believed Doe voluntarily participated in (i.e., consented to) the intercourse with Sandoval, he (Velasquez) did not aid or abet a rape. In support of this argument, the record contains evidence that Velasquez saw Doe and Sandoval hugging and kissing at the party and in

18

the bedroom, that Doe undressed herself in the bedroom, that he believed Doe and Sandoval invited him to join them, and that he never heard Sandoval tell Doe to do what Velasquez told her to do (i.e., to orally copulate him) or she would suffer. Velasquez's brother and sister also testified that they saw Doe and Sandoval hugging and kissing in the bedroom.

The jury found Velasquez guilty of rape in concert, as charged in count 1.

2.      *Law*

Under the California Constitution, a unanimous jury verdict is required to convict a person of a crime. (Cal. Const., art. I, § 16; *People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) In particular, the jury must agree unanimously that the defendant is guilty of a *specific crime*. (*People v. Diedrich* (1982) 31 Cal.3d 263, 281.)

When a defendant is charged with a criminal offense, but the evidence suggests *more than one discrete crime*, either the People must elect among the crimes or the trial court must instruct the jurors that they all agree on the same criminal act. (*Russo*, *supra*, 25 Cal.4th at p. 1132; see CALCRIM No. 3500.[5]) A trial court is required sua sponte to give a unanimity instruction where the evidence in the case suggests more than one

---

[5]      "The defendant is charged with *<insert description of alleged offense>* [in Count _____] [sometime during the period of _____ to _____]. [¶] The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed." (CALCRIM No. 3500.)

19

discrete crime and the prosecutor does not elect among the crimes.[6] (*Russo*, at p. 1132; *People v. Riel* (2000) 22 Cal.4th 1153, 1199.)  The requirement for such an instruction " 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' " (*Russo*, at p. 1132.)  However, "where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty."[7] (*Ibid.*)

A related exception to the unanimity requirement is that the jurors need not agree on the specific criminal act where the offense constitutes a "continuous course of conduct." (*People v. Maury* (2003) 30 Cal.4th 342, 423 (*Maury*); see 5 Witkin, Cal. Crim. Law (4th ed. 2012) Crim. Trial, § 729, p. 1133.)  This exception arises " ' "when the acts alleged are so closely connected that they form part of one and the same transaction, *and thus one offense*." ' "[8] (*People v. Hernandez* (2013) 217 Cal.App.4th

---

[6]    Here, the prosecutor did not elect, and Velasquez did not request a unanimity instruction.

[7]    For example, in deciding whether a defendant is guilty of murder, "the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator." (*People v. Santamaria* (1994) 8 Cal.4th 903, 918; see *People v. Jenkins* (2000) 22 Cal.4th 900, 1024-1025 [jury may convict defendant of first degree murder without making unanimous determination whether murder was deliberate and premeditated or committed during the course of a felony].)

[8]    Although inapplicable here, the exception is also used when the criminal statute contemplates a continuous course of conduct or a series of acts over a period of time. (*Hernandez, supra*, 217 Cal.App.4th at p. 572.)  Examples include statutes criminalizing

559, 572 (*Hernandez*), italics added; see *People v. Benavides* (2005) 35 Cal.4th 69, 98 (*Benavides*) [same; jury not required to agree on which specific act of rape or sodomy supported conviction of lewd and lascivious conduct].)

In sum, although a unanimity instruction is required where there are *discrete crimes*, it is not required where the acts are so closely connected as to form *one offense* even if supported by different theories.

Because our consideration of whether the trial court should have given a particular jury instruction involves a mixed question of law and fact which is " 'predominantly legal,' " we review de novo the issue whether a unanimity instruction was required here. (*Hernandez*, *supra*, 217 Cal.App.4th at p. 568 [unanimity instruction].)

3.    *Analysis*

In support of his position that two discrete criminal acts may have been committed (one as principal and one as aider and abettor), Velasquez first contrasts the People's information against him with the People's information against Sandoval.  The People charged Sandoval with *two counts* of violating section 264.1, subdivision (a):  in one count, as principal, by "unlawfully and voluntarily acting with another person, *personally*" to rape Doe; and in another count, as aider and abettor, by "unlawfully and voluntarily acting with another person, *by aiding* [*and*] *abetting Vincent Velasquez*," to rape Doe.  (Italics added.)  In contrast, here the People charged Velasquez with one count

_____

pimping, pandering, failure to provide for a minor, contributing to the delinquency of a minor and child abuse.  (*People v. Avina* (1993) 14 Cal.App.4th 1303, 1309 [collecting cases].)

of violating section 264.1, subdivision (a) by "unlawfully and voluntarily acting with another person, *personally and by aiding and abetting the other person*," to rape Doe. (Italics added.) The differences in the two informations do not, by themselves, establish two discrete criminal acts by Velasquez. Indeed, the language in the charging document specifying that Velasquez was both a principal and an aider and abettor not only suggests that the prosecution based its charge on a continuous course of conduct, but also " 'alerts the jury that the charge consists of a continuous course of conduct, to be proved by evidence of more than one individual act.' " (*People v. Leonard* (2014) 228 Cal.App.4th 465, 491 [pandering].)

Regardless, on the merits, we are satisfied that a unanimity instruction was not required here, because all of the acts of rape, regardless who was the principal and who was the aider and abettor, were part of a continuous course of conduct with acts so closely connected as to form one ongoing offense. (*Maury*, *supra*, 30 Cal.4th at p. 423; *Benavides*, *supra*, 35 Cal.4th at p. 98.) The men did not allow Doe to leave the eight-foot by 12-foot room (that contained only a couch and mattress) for over four hours, during which time nonstop sexual activity occurred until Velasquez allowed Doe to leave.

Velasquez emphasizes that he presented distinct defenses to the different acts — lack of penetration as to acts in which Doe testified Velasquez was the principal, and lack of knowledge that Doe had not consented to the acts in which she testified Sandoval was the principal. Quoting from *People v. Percelle* (2005) 126 Cal.App.4th 164, 181 (*Percelle*), Velasquez suggests that the continuous course of conduct exception *only* applies "when '[ "]the defendant offers *essentially the same defense* to each of the acts,

22

and there is no reasonable basis for the jury to distinguish between them.["  ]'  "  (Italics added.)  However, that is not what *Percelle* says; Velasquez conflates two independent exceptions to requiring a unanimity instruction.  As Division Two of our court recently explained, quoting more fully from *Percelle*:

> "[A] unanimity instruction is not ' "required when the acts alleged are so closely connected as to form part of one continuing transaction or course of criminal conduct," ' *or* ' " 'when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them.' [Citations.]" [Citation.]' ([*Percelle*, *supra*,] 126 Cal.App.4th 164, 181-182.)"

(*Hernandez*, *supra*, 217 Cal.App.4th at p. 572, italics added.)

Thus, the unanimity instruction is unnecessary in *either* of *two* situations: (1) where the defendant asserts essentially the same defense to each of the acts that could justify the conviction, and there is no reasonable basis for the jury to distinguish between the defenses; or (2) where the acts alleged are so closely connected that they formed one continuing course of criminal conduct.  (*Percelle*, *supra*, 126 Cal.App.4th at pp. 181-182; *Hernandez*, *supra*, 217 Cal.App.4th at p. 572.)  Notably, Velasquez presents no argument on appeal in response to the second situation, which was what was before the trial court here — namely, acts so closely connected that they formed one continuous course of conduct.  Indeed, Velasquez cites three authorities that he contends cannot be distinguished from the present case, but in each the court required a unanimity instruction *only because the defendant offered evidence of distinct defenses to separate acts*; there was no issue on appeal as to whether the defendant's separate acts were so closely connected that they formed one continuing course of criminal conduct.  (*Hernandez*, at

23

p. 575 ["separate instances of possession [of a gun], separated by time and space"]; *People v. Castaneda* (1997) 55 Cal.App.4th 1067, 1070-1071 [charge of possession of heroin; heroin found on television set at home prior to arrest, and heroin found in defendant's pocket later in the day after arrest]; *People v. Laport* (1987) 189 Cal.App.3d 281, 282-283 [one count of grand theft with evidence of embezzlement and theft over a 15-month period].)[9]

Contrary to Velasquez's argument on appeal, just because he presented two distinct defenses — lack of penetration to the evidence that Velasquez raped Doe, and lack of knowledge of the evidence that Doe did not consent to the sexual intercourse with Sandoval — does not affect our consideration as to whether the rapes, regardless who was the principal, were part of a continuous course of conduct with acts so closely connected as to form one ongoing offense. Because of the overwhelming evidence of a continuous course of conduct, the trial court did not err in failing to instruct the jury on unanimity.

C.      *The Trial Court Did Not Commit Reversible Error in Failing to Instruct the Jury Sua Sponte on a Lesser Included Offense*

Velasquez argues that the trial court erred in failing to instruct the jury on assault with intent to commit rape, a lesser included offense of rape in concert. The People

---

[9]      Additionally, Velasquez relies on *People v. Wolfe* (2003) 114 Cal.App.4th 177, 184, and *People v. Crawford* (1982) 131 Cal.App.3d 591, 599, for the argument that his distinct defenses also preclude application of a *different* exception to the unanimity requirement — an exception where the two criminal acts are so substantially identical in nature that any juror believing one act took place would also believe that all acts took place. However, the People do not contend the criminal acts here are so substantially identical to preclude application of the unanimity requirement.

24

respond by arguing, first, that there was no substantial evidence to support such an instruction and, second, that even if the instruction was required, the error did not prejudice Velasquez.

Although the court erred in failing to instruct the jury on the lesser included crime, the error was harmless.

1.     *Additional Background*

Velasquez again relies on the two defenses he presented to count 1, rape in concert:  To the extent he was considered the principal, he did not penetrate Doe; and to the extent he was considered the aider and abettor, he was unaware Doe had not consented to the sex with Sandoval.  From this premise, Velasquez argues on appeal that, because there was the possibility that the jury would find (1) that he was unaware Doe had not consented to the sex with Sandoval (and thus would acquit on the aiding and abetting charge) and (2) that he did not penetrate Doe (and thus would acquit on the rape charge), the court was required to instruct the jury on assault with intent to commit rape — an offense included within a charge of rape in concert.

In support of his defense based on a lack of penetration, Velasquez directs us to evidence in the record from both him and Doe that suggests he did not penetrate her vagina with his penis.  In response, the People tell us that there is "no evidence" that Velasquez attempted but failed to penetrate Doe's vagina with his penis.

2.     *Law*

Because "*every*" lesser included offense that is supported by substantial evidence "must" be presented to the jury, "a trial court errs if it fails to instruct, sua sponte, on all

25

theories of a lesser included offense which find substantial support in the evidence."

(*People v. Breverman* (1998) 19 Cal.4th 142, 155, 162 (*Breverman*).)  This sua sponte

responsibility arises regardless of the wishes of trial counsel or the parties, whenever

substantial evidence supports the lesser charge.  (*Id.* at pp. 158, 162.)  In this context,

substantial evidence means " ' "evidence from which a jury composed of reasonable

[persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was

committed."  (*Id.* at p. 162.)  In determining the substantiality of evidence, a trial court is

to consider only the "legal sufficiency" of the evidence, not its weight or the credibility of

the witnesses who presented the evidence.  (*Id.* at p. 177.)

Without deciding the issue, for purposes of this argument we accept the parties'

agreement that assault with intent to commit rape (§ 220, subd. (a)(1))[10] is a lesser

included offense of rape in concert (§ 264.1, subd. (a)).  (See *In re Jose M.* (1994) 21

Cal.App.4th 1470, 1476-1477.)  Thus, as applicable here, because Velasquez was

charged with raping Doe (while Sandoval aided and abetted), if the record contains

substantial evidence both that Velasquez assaulted Doe with the intent to rape her and

that he did not rape her, the trial court was required to instruct the jury on assault with

intent to rape.  (*Breverman*, *supra*, 19 Cal.4th at p. 162.)

We review de novo whether a jury instruction on a lesser included offense should

have been given.  (*People v. Waidla* (2000) 22 Cal.4th 690, 733 [trespass and assault as

lesser included offenses in burglary and robbery, respectively].)  In so doing, we view the

---

10    A crime is committed under section 220, subdivision (a)(1) whenever "any person
. . . assaults another with intent to commit . . . rape . . . in violation of Section 264.1 . . . ."

26

evidence in a light most favorable to Velasquez, resolving any doubts as to the sufficiency of the evidence in his favor.  (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1482-1483 & fn. 7 [voluntary manslaughter and second degree murder as lesser included offenses in first degree murder].)

3.      *Analysis*

The Attorney General tells us that "there was *no evidence* presented that [Velasquez] attempted . . . but failed to penetrate Doe's vagina with his penis."  (Italics added.)  Although that statement accurately reflects *Velasquez's* trial testimony — because Velasquez testified that he neither attempted to have nor succeeded in having intercourse with Doe — the statement fails to take into account *Doe's* inconsistent recollection of the event.

Velasquez and Doe each testified without contradiction that Velasquez could not get an erection after ejaculating during oral copulation.  Doe then testified that, despite his flaccid penis, Velasquez attempted sexual intercourse from behind her.  Despite some evidence of penetration, Doe's testimony regarding penetration was not consistent:  She testified at least once that she could not feel whether Velasquez penetrated her vagina and at least twice that she was not sure whether Velasquez penetrated her vagina; and at the hospital on the night of January 11, she told one of the investigating officers that Velasquez did not penetrate her and that he only rubbed his penis on the outside of her vagina.

In response to this evidence, the People refer us to Doe's later testimony in which she clearly and unequivocally testified that Velasquez penetrated her vagina.  However,

27

we merely review the record for substantial evidence; we do not weigh the evidence or make credibility determinations. (*Breverman*, *supra*, 19 Cal.4th at p. 177.) Moreover, by relying on this *later* testimony by Doe, the Attorney General impliedly confirms that the record *earlier* contains substantial evidence to the contrary. Indeed, this unequivocal testimony of penetration was elicited during the People's redirect examination — *after* Doe's earlier equivocation (on direct and cross-examination) that she was not sure whether Velasquez had penetrated her and *after* Doe's earlier testimony (on cross-examination) that she told an investigating officer Velasquez had not penetrated her.

Thus, if the jury believed (1) Doe merely rubbed his penis on the outside of, but did not penetrate, Doe's vagina (Velasquez's defense as principal), and (2) Velasquez was unaware Doe did not consent to the sexual advances of Sandoval (Velasquez's defense as aider and abettor), then the jury could have acquitted Velasquez of rape in concert yet still convicted him of assault with the intent to rape. Accordingly, because the record contains substantial evidence from which a jury could conclude that Velasquez committed the lesser crime (assault with intent to rape) but not the greater crime (rape in concert), the trial court erred in failing sua sponte to instruct the jury on the lesser crime. (*Breverman*, *supra*, 19 Cal.4th at pp. 155, 162; *People v. Eid* (2014) 59 Cal.4th 650, 656.)

The question remains whether this error was prejudicial, since reversal is required only if the error "resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) We apply the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) to determine whether the failure to instruct on the lesser included offense resulted in a miscarriage of justice requiring reversal. (*People v. Beltran* (2013) 56 Cal.4th 935, 955;

28

*Breverman*, *supra*, 19 Cal.4th at p. 178.) Under this standard, such error is reversible only when there is a reasonable probability that the appellant would have received a more favorable result had the instruction been given. (*Breverman*, at p. 178; *Watson*, at p. 836.) For purposes of this analysis, a "reasonable probability" is one sufficient to undermine the confidence in the conviction. (*Strickland v. Washington* (1984) 466 U.S. 668, 694.) "Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration." (*Breverman*, at p. 177.) In this context, we may consider the relative strength of the evidence in support of the judgment compared to the relative weakness of the evidence in support of a different outcome. (*Ibid.*) The appellant bears the burden of establishing prejudice. (*People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.)

With regard to Velasquez as principal, Velasquez argues that the evidence regarding penetration "was not overwhelming." We disagree. Initially, the jury could not have believed Velasquez; otherwise, it would have acquitted him entirely, since his testimony was that there was no penetration because he did not attempt vaginal intercourse with Doe. Looking next to Doe's testimony, although she did equivocate as we described *ante*, once the prosecutor explained to Doe the legal definition of penetration on redirect, she testified unequivocally that Velasquez penetrated her.[11] Doe

---

11 "[Prosecutor:] You were also asked some questions about whether or not you were sure the defendant was able to penetrate you, and I want to ask a more specific question. [¶] If when we ask about penetration we mean *any penetration, however slight,* does that make it an easier question for your to answer?
     "[Doe:] Yes.

explained that by the time she met with the police officer at the hospital, she had been given medication that made her "fuzzy" and "was confused," and that she was "sure now" that Velasquez had penetrated her. Also, on January 11, once Doe reported the incident: based on her *first* interview with a police officer (which was *prior* to the interview with a different officer described in the preceding sentence), the officer testified that Doe told him she "was certain" Velasquez had penetrated her vagina with his penis;[12] and the nurse who examined Doe at the hospital confirmed that, during the interview, Doe told her that Velasquez had penetrated her vaginally. Finally — and most persuasively — when a police officer interviewed Velasquez (having told him she was investigating allegations by Doe), without qualification Velasquez admitted that he had had "vaginal sex" with Doe on January 11.[13]

With regard to Velasquez as aider and abettor, Velasquez suggests that, because the jury returned not guilty verdicts on counts 3 and 4 (forcible sexual penetration in concert and forcible sodomy in concert, respectively) and because the jury asked for a clarification on the aiding and abetting instruction, the jury likely had difficulty finding

"[Prosecutor:] Did the defendant penetrate you, however slightly?
"[Doe:] Yes, he did." (Italics added.)
Consistently, pursuant to CALCRIM No. 1000, the court instructed the jury:
" 'Sexual intercourse means *any penetration, no matter how slight,* of the vagina or genitalia by the penis.' " (Italics added.)

12    The officer even showed where in his written report he noted the vaginal penetration.

13    Velasquez first explained to the officer that Doe initiated the sexual activity with him and later in the interview that Sandoval invited Velasquez to join him (Sandoval) and Doe.

30

that Velasquez aided or abetted Sandoval's rape. We disagree. First, counts 3 and 4 had to do with anal penetration by Sandoval, and the jury could have believed such acts never took place. With regard to vaginal penetration, Velasquez's only defense was that he was unaware Doe had not consented to the sex with Sandoval. Velasquez's testimony in this regard (that he never heard Doe say "no" or otherwise communicate a lack of consent over the course of the four hours and he did not hear what Sandoval told Doe before Velasquez joined them) was not credible, and Doe's testimony of her lack of consent was both credible and overwhelming.[14]

Because Velasquez did not establish that there is a reasonable probability he would have received a more favorable result had the instruction on the lesser charge been given, Velasquez did not meet his burden of establishing prejudice and, thus, reversible error.

D.    *The Trial Court Did Not Err in Its Consideration of Velasquez's Two Prior Convictions of Gang Participation*

Velasquez presents two independent arguments based on the court's true findings of his two prior strike convictions. First, he argues that the court erred by not vacating or invalidating both prior convictions. Alternatively, he argues that the court abused its discretion in declining to strike the prior convictions as applicable to count 1 (rape in concert). The People respond by arguing, first, that the trial court properly refused to

---

[14]    In addition to our independent review of the evidence, we note the trial court's comment that Doe presented "most certainly, by far, the most compelling testimony from a victim in a sexual assault case" that the court had ever heard.

31

vacate the prior convictions and, second, that Velasquez did not meet his burden of establishing the court abused its discretion in declining to strike the priors as to count 1.

The trial court did not err in its consideration of Velasquez's prior two strike convictions.

1.    *Additional Background*

In April 2012, the People filed a two-count criminal complaint against Velasquez (2012 Complaint), alleging:  In count 1, Velasquez was a felon in possession of a firearm in violation of section 29800, subdivision (a); and in count 2, Velasquez committed street terrorism in violation of section 186.22, subdivision (a).[15]  Later in April 2012, Velasquez pleaded guilty to count 2 (2012 Conviction), and the court dismissed count 1. At the time of the plea, Velasquez acknowledged that the 2012 Conviction would be a "strike."  The court imposed a sentence of one year four months.

Less than one year later, in April 2013, the People filed another two-count criminal complaint against Velasquez (2013 Complaint), alleging:  In count 1, Velasquez committed street terrorism in violation of section 186.22, subdivision (a); and in count 2, Velasquez was a felon in possession of metal knuckles in violation of section 21810.[16]

---

[15]    This offense is also referred to as "gang participation."  (*People v. Rios* (2013) 222 Cal.App.4th 542, 558.)

[16]    The 2013 Complaint also named Velasquez's brother, Jamerson, charging him with one count of possession of a controlled substance in violation of Health and Safety Code section 11377, subdivision (a).

In June 2013, Velasquez pleaded guilty to count 1 (2013 Conviction).[17] At the time of the plea, Velasquez acknowledged the 2013 Conviction would be a second "strike." The court imposed a sentence of one year four months.

Prior to the court trial to determine the truth of the charging allegations that Velasquez had been convicted of the two prior strikes, Velasquez filed a motion to invalidate the 2012 Conviction.[18] In the motion, Velasquez argued that, in the "felonious criminal conduct by members of th[e] gang" (§ 186.22, subd. (a)) underlying the street terrorism conviction in the 2012 Conviction, Velasquez acted *alone* with no other gang member.[19] This fact was important to Velasquez, because he sought to

---

[17] We assume the court dismissed count 1, but the record on appeal does not contain a copy of an order of dismissal or court minutes reflecting such dismissal.

[18] The three-page document is entitled "Motion to Set Aside Prior Conviction; Petition for Writ of Error Coram Nobis; Petition for Writ of Habeas Corpus; Motion to Vacate Judgment of Conviction; Request for Evidentiary Hearing." In one and a half pages of text with no legal authority as to the procedure being invoked, Velasquez asked the court "to invalidate" the 2012 Conviction.

[19] The street terrorism statute, section 186.22, subdivision (a), provides a criminal punishment for anyone convicted of "actively participat[ing] in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists *in any felonious criminal conduct by members of that gang*." (*Ibid*., italics added.) Velasquez's appellate counsel tells us the underlying " 'felonious criminal conduct' " in count 1 of the 2012 Complaint was Velasquez's "lone act of possession of a firearm." However, counsel presents no record reference or evidence to support the statement, and the arguments of counsel are not evidence. (*People v. Gardner* (1969) 71 Cal.2d 843, 849 (*Gardner*) ["Matters not presented by the record cannot be considered on the suggestion of counsel in the briefs."]; *In re Zeth S.* (2003) 31 Cal.4th 396, 413, fn. 11 [counsel's statements in brief to court are not evidence]; *People v. Wallace* (2004) 33 Cal.4th 738, 754, fn. 3 (*Wallace*) [in § 1385, subd. (a) proceedings to strike a prior strike conviction, defense counsel's explanation of

33

vacate the 2012 Conviction on the basis that, in *People v. Rodriguez* (2012) 55 Cal.4th 1125 — an opinion filed *after* the 2012 Conviction — our Supreme Court held that a conviction under section 186.22, subdivision (a) requires that the underlying felony be committed "by at least two gang members." (*Rodriguez*, at p. 1132.) According to Velasquez, therefore, since he pled guilty to a crime he did not commit, he was entitled to have the conviction "invalidate[d]."

The People opposed the motion on the basis that it was an improper collateral attack on the factual basis underlying Velasquez's plea to the 2012 Complaint.

The court denied the motion, orally citing and quoting from *People v. Maultsby* (2012) 53 Cal.4th 296: Because " '[a] guilty plea admits every element of the offense charged and is a conclusive admission of guilt,' " by pleading guilty, Velasquez " 'waive[d] any right to raise questions about the evidence, including its sufficiency,' " underlying count 1 of the 2012 Complaint. (*Id.* at p. 302.)

The court then held a trial on the truth of two prior strike convictions. After receiving evidence and hearing the argument of counsel, the court found true the allegations of the two prior strike convictions that are at issue in this appeal — namely, the violations of section 186.22, subdivision (a) in 2012 and 2013.[20] At sentencing, the

---

events surrounding defendant's plea not evidence].) We discuss this further at part III.D.3.a., *post*.

[20]    The court also found true other allegations of prior convictions, none of which are at issue in this appeal.

court exercised its discretion under section 1385, subdivision(a),[21] and struck the allegations of the two prior strike convictions as to count 2 only.

    2.    *Law*

In *In re Madrid* (1971) 19 Cal.App.3d 996 (*Madrid*), three habeas corpus petitioners challenged their convictions of kidnapping for robbery under section 209. (*Id.* at p. 998.) Although each petitioner had pled guilty, between the date of the last plea and the filing of the three writ petitions, the Supreme Court issued an opinion in which it interpreted section 209 as requiring proof of an element that, according to each of the three petitioners, was not present in the underlying criminal case in which he pleaded guilty. (*Madrid*, at p. 998.) Significantly, the record in each underlying case supported each petitioner's contention regarding the element of proof missing in his case. (*Id.* at p. 1003.) Based on the *facts* in the underlying records, the Court of Appeal issued the requested writ relief, allowing each petitioner to withdraw the guilty plea in his underlying criminal case. (*Id.* at pp. 1006-1007.) The Supreme Court agreed with this reasoning and, citing and relying on *Madrid*, granted the same relief two years later to a similarly situated habeas corpus petitioner in *In re Crumpton* (1973) 9 Cal.3d 463, 467-469 (*Crumpton*).

---

[21] "The judge or magistrate may, either of his or her own motion or upon the application of the prosecuting attorney, and in the furtherance of justice, order an action to be dismissed. . . ." (§ 1385, subd. (a).) Our Supreme Court has construed this statute "as permitting a judge to dismiss . . . the allegation that a defendant has previously been convicted of a felony." (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 508 (*Romero*).)

Because Velasquez did not tell the trial court — and does not suggest to us on appeal — the procedural basis on which he brought his motion to invalidate the 2012 Conviction (see fn. 18, *ante*.), our ability to determine the appropriate standard of review has been hampered. However, given the basis of our ruling, *post*, the standard of review does not affect the outcome.

We review for an abuse of discretion the trial court's decision not to strike the priors on count 1. (*Romero*, *supra*, 13 Cal.4th at p. 504.) In so doing, we consider only whether "the ruling in question 'falls outside the bounds of reason' " in light of the "applicable law and the relevant facts." (*People v. Williams* (1998) 17 Cal.4th 148, 162 (*Williams*) [review of order vacating prior strikes under § 1385, subd. (a)].)

3.      *Analysis*

a.      *Order Denying Motion to Invalidate 2012 Conviction*

Velasquez's argument that the 2012 Conviction should be invalidated is based on the *factual* premise that Velasquez acted alone with no other gang member. Despite appellate counsel's statement that "the record clearly shows [Velasquez] did not commit that crime," the record on appeal contains no *evidence* of any *facts* related to the acts underlying the 2012 Conviction. More specifically, Velasquez's motion did not contain any evidence; and at the hearing on the motion, counsel did not proffer any evidence, merely stating that he "would like" the court to conduct an evidentiary hearing.[22] The

---

[22]    To the extent trial counsel asked for an evidentiary hearing and the court only entertained oral argument, Velasquez does not raise any issue on appeal.

36

arguments of counsel — both in the trial court and on appeal — are not evidence. (*Gardner*, *supra*, 71 Cal.2d at p. 849; *Wallace*, *supra*, 33 Cal.4th at p. 754, fn. 3.)

Notably, in *Madrid*, each of the three petitioners presented a reporter's transcript of proceedings in which *evidence* of the *facts* underlying the offense to which the petitioner pled guilty was presented to the trial court in each of the habeas corpus proceedings. (*Madrid*, *supra*, 19 Cal.App.3d at p. 1002 [two preliminary hearing transcripts and one grand jury proceeding transcript].) Likewise, in *Crumpton*, the habeas corpus petitioner presented *evidence* of the underlying *facts* contained in a reporter's transcript from a preliminary hearing. (*Crumpton*, *supra*, 9 Cal.3d at p. 467.) Thus, whereas in *Madrid* and *Crumpton* the records contained *evidence* of *facts* that each petitioner did not commit the crime to which he pled guilty, here there is no record that Velasquez did not commit the crime to which he pled guilty.

" '[T]he judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error.' " (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 227.) Our review is "limited to consideration of the matters contained in the appellate record," and in this regard "[t]he appellant has the burden of furnishing an appellate court with a record sufficient to consider the issues on appeal." (*People v. Neilson* (2007) 154 Cal.App.4th 1529, 1534.) In *People v. Siegenthaler* (1972) 7 Cal.3d 465 (*Siegenthaler*), for example, in an appeal from a denial of a motion to set aside an information, a defendant who "failed to include as part of the record on appeal the transcript of the preliminary hearing . . . [was] precluded from seeking appellate review of the denial of the motion." (*Id.* at p. 469.) Based on the record in the present appeal,

37

the only *evidence* (as opposed to argument) that was before the court was Velasquez's guilty plea on which the trial court based its finding that Velasquez suffered a strike conviction.

As in *Siegenthaler*, therefore, because Velasquez failed to provided *evidence* of the *facts* he contends entitled him to have the 2012 Conviction invalidated, he is precluded from seeking appellate review of his motion. For this reason, Velasquez has not met his burden of establishing that the trial court erred in denying his motion to set aside the 2012 Conviction.

In his opening brief, Velasquez also raises the issue of his entitlement to invalidate the 2013 Conviction. Because trial counsel did not include the 2013 Conviction in his motion to invalidate the 2012 Conviction, appellate counsel presents the issue in the context of constitutionally ineffective assistance of trial court. Once again, however, because Velasquez has failed to provide *evidence* of the *facts* he contends might entitle him to have the 2013 Conviction invalidated, any error in failing to include the 2013 Conviction in the motion is necessarily harmless. (*Watson*, *supra*, 46 Cal.2d at p. 836.) Thus, we have no reason to consider whether trial counsel was ineffective.

In the event Velasquez attempts to invalidate either the 2012 Conviction or the 2013 Conviction in subsequent proceedings, we express no opinion on the procedure he may employ or the merits of any argument he may raise.

b.    *Order Denying* Romero *Motion to Strike Prior Convictions on Count 1*

Velasquez argues that the trial court abused its discretion in not striking the 2012 Conviction or the 2013 Conviction on count 1.  He suggests that because the trial court ruled that the prior strikes were both " 'purely status offenses' "[23] and "not criminalized by section 186.22, subdivision (a)," Velasquez is "squarely outside the spirit of the Three Strikes law."  We disagree.

When a trial court is presented with the consideration whether to strike a prior strike conviction, the court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies."  (*Williams*, *supra*, 17 Cal.4th at p. 161.)  The trial court here did exactly what is required of it.  In declining to strike the two priors as to count 1, the court:  began its analysis by expressly stating that it considered *Williams* and *Romero* and was exercising its discretion in the "further . . . interest of justice"; found that the convictions in the present case were for "violent and serious crimes" and the underlying offenses had a considerable impact on a victim; detailed at least a dozen convictions from Velasquez's extensive criminal history *other than* the two strike convictions and the jury verdicts in the

---

[23]    Apparently the trial court accepted trial counsel's offer of proof as to the facts underlying the two convictions.

present case, which presented "a pretty dismal example of citizenship" and "d[id] him considerable harm";[24] noted that the two prior strikes came close in time[25] and did not occur during "an aberrant period of lawlessness"; and, as to Velasquez's character and future prospects, found that Velasquez had no special education or training that would allow him to compete in today's job market for anything other than a low level position.[26] Based on those findings, the court's ruling was not arbitrary or beyond the bounds of reason.

Although Velasquez acknowledges the *Williams* factors we quoted *ante*, (*Williams*, *supra*, 17 Cal.4th at p. 161), he does not attempt to establish how the court's analysis and application of these factors were inappropriate or erroneous in this case. Instead, as we mentioned, Velasquez contends only that, because the court found both prior strikes were " 'purely status offenses,' " the court erred in not striking them on the basis they are "squarely outside the spirit of the Three Strikes law" — without telling us what he contends is "the spirit of the Three Strikes Law" or providing us with legal authority supporting the argument that the court's failure to strike the priors is outside that

---

[24]    These offenses included assault with a deadly weapon, battery and burglary as a juvenile; and as an adult, they included burglary, petty theft, public intoxication, failure to appear, possession of stolen property, assault with force, felon in possession of a firearm, and numerous probation and parole violations over the years. Velasquez was 29 years old at the time of his arrest in this case.

[25]    The 2013 Complaint was filed less than a year after the 2012 Complaint.

[26]    Velasquez did not finish high school and never held a job for any appreciable period of time.

"spirit."  As such, Velasquez did not meet his burden of establishing an abuse of discretion.

The trial court did not err in declining to strike either the 2012 Conviction or the 2013 Conviction for purposes of sentencing Velasquez on count 1.

E.      *Velasquez Did Not Meet His Burden of Establishing Reversible Error in Sentencing*

Velasquez argues that the judgment should be reversed and the matter remanded for resentencing because the total sentence on both counts is inconsistent with the court's oral pronouncement of the total sentence.[27]  The People's position is that, because the clerk's and reporter's transcripts are consistent with the sentences *on each count*, the court merely made a mathematical error in *totaling* Velasquez's prison time, and there is no need for resentencing.

Under the totality of the circumstances, Velasquez is not entitled to be resentenced.

1.      *Additional Background*

The court conducted two sentencing hearings — one on October 3 and one on October 21.  The minutes from the October 3 hearing do not reflect a complete sentence and conclude with the entry, "[T]he defendant is not properly sentenced."  At the October 21 hearing, the court explained that at the prior hearing the court may have failed to formally pronounce a sentence on count 1, and both counsel agreed.  Accordingly, the

_____

[27]      Although the sentence contained other terms and conditions, throughout this part of the opinion, the only portion of the sentence at issue — and, thus, the only portion of the sentence we will discuss — is the prison term.

41

court sentenced Velasquez at the October 21 hearing, as follows: On count 1, the court orally pronounced an indeterminate sentence of 39 years to life, and on count 2, the court orally pronounced a sentence of 17 years.[28] Consistently, these identical prison terms are reflected in the clerk's minutes and the abstract of judgment for each count.

In addition to orally pronouncing a sentence on each of the two counts on October 21, the court stated, "So combining the counts 1 and 2 . . . , *total commitment is 46 years to life*." (Italics added.) Inconsistently, the clerk's minutes reflect: "Total state prison time is *56 years to life*." (Italics added.)

2. *Law*

Velasquez relies on the concept that the abstract of judgment is not the judgment; it "may not add to or modify the judgment it purports to digest or summarize." (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

3. *Analysis*

Velasquez's position is that, because the court orally stated the total sentence "is 46 years to life," we cannot determine whether this total sentence influenced the trial court's discretionary sentencing choices on each of the individual counts; and, if so, then the discretionary sentencing on the two counts would be wrong, since the apparent exercise of the court's discretion totaled *56 years*, not *46 years*. Velasquez describes the issue as a clerical error in not accurately recording in the court's minutes the court's oral pronouncement of the total sentence — a clerical error that cannot be corrected without a

---

28    As we explain *post*, each of these sentences includes all enhancements.

remand for resentencing. The People's position is that the court clearly exercised its discretion as required as to each count, and the court merely "misspoke" in stating the total commitment was *46 years* instead of *56 years* (39 + 17).

At the October 3 hearing, the court exercised its discretion as follows as to count 2:[29]

> "I . . . do also recognize that I have the ability obviously, under Penal Code Section 1385, to dismiss or strike allegations, and I am going to do so as to Count 2. I am going to strike both strikes as to Count 2. And the reason I am going to do that is that . . . Mr. Velasquez was not actively engaged in conduct which would constitute theft or a crime which would harm a personal victim . . . , although I will note he did possess a firearm in one of the prior strikes. There was no indication he was doing anything other than carrying it. So to this [count], I think Mr. Velasquez is partially outside the spirit of the Three Strikes statute, and that's why I am striking both strikes as to Count 2.

> "[T]he sentences are mandated to be consecutive, so Count 2 will be consecutive to Count 1. . . . [T]he primary support for that is Penal Code section 1170.12 and, I believe it is, (a)(7). In case there is other support needed for that, in an exercise of discretion, I would find that the defendant has not shown remorse and also that there is reasonable likelihood that, if not imprisoned, he will continue to be a danger to others as an independent justification for [a] consecutive sentence.

> "There is a need to make a sentencing choice as to which term to apply. It's not a one-third the mid. It is a full consecutive term. So I am choosing the mitigated term of five years. And I am doing that . . . . Relying on circumstances in mitigation, . . . the defendant played a minor role in the offense, and I thought that there was some indication that there was a level of intoxication involved.

> "And I fully realize that to strike a strike is an extraordinary exercise of discretion, . . . and I can only say I have stated my reasons.

---

[29] The punishment for oral copulation in concert, as alleged in count 2 is "imprisonment in the state prison for five, seven, or nine years." (§ 288a, subd. (d)(1).)

"The sentence as to Count 2, therefore, will be[:] [¶] . . . [¶] [A] mitigated term of five years is imposed to be consecutive with an enhancement for a prior serious felony conviction pursuant to Penal Code section 667(a)(1), a period of five years, the second five years enhancement to be consecutive, same serious felony prior under 667(a)(1), a period of five years, and two one-year state prison priors under 667.5(B). *So the total as to Count 2 will be 17 years*." (Italics added.)

Also at the October 3 hearing, the court explained that it placed in the court's file a written copy of *all* of its "sentencing choices." As to count 2, the written choices are consistent with both the court's oral statements quoted *ante* and the court's oral statements in the exercise of its discretion on Velasquez's *Romero* motion (in which the court struck the two prior strikes) described *ante* at part III.D.3.b.[30] As to the sentencing on count 1, the court's detailed written explanation is as follows:[31]

"Sentencing as to Count 1:

"1. The greatest minimum sentence is option 1, 3x9 years, the aggravated term for P.C. 264.1, for a total of 27 years to life.

"2. The upper term of 9 years is selected for the following reasons:

"a. The defendant was an active participant in the commission of the crime.

---

[30] We note that, at the August 29 hearing at which the court heard arguments on Velasquez's *Romero* motion, when the court mentioned the sentence it had been considering, the court estimated the total term would be "around 60 some years."

[31] The punishment for rape in concert, as alleged and proven in count 1, is "confinement in the state prison for five, seven, or nine years." (§ 264.1, subd. (a).) Based on the true findings of the 2012 Conviction and the 2013 Conviction and the selection of the upper term for the section 264.1, subdivision (a) conviction, the punishment "shall be an indeterminate term of life imprisonment with a minimum term of the indeterminate sentence . . ." trebled. (§§ 1170.12, subd. (c)(2)(A)(i), 667, subd. (e)(2)(A)(i).)

44

"b.  The defendant inflicted emotional injury.

"c.  The defendant's record begins as a minor and has continued rather consistently until his conviction in this case indicating a pattern of regular criminal conduct.

"d.  The defendant's performance on probation and parole has not been satisfactory.  He was on a grant of parole at the time he committed the crime for which he has been convicted.

"For purposes of making this selection the court finds no circumstances in mitigation.

"3.  Priors:

"a.  [Two] P.C. 667(a) priors were found true and defendant will serve an additional determinate term of 5 years for each such prior conviction, consecutive to each other, consecutive to the life term, and consecutive to Count 2.

"b.  [Two] P.C. 667.5(b) [priors] were found true and defendant will serve an additional determinate term of 1 year for each such prior conviction, consecutive to each other, consecutive to the life term, and consecutive to Count 2.

"4.  *The total term for Count 1 is 39 years to life*."  (Italics added.)

The written explanation also contains a notation at the end, "[t]otal commitment is 46 years to life."

At the October 21 hearing, the court confirmed the October 3 exercise of its discretion communicated to counsel on count 1:

"THE COURT:  Well, I know I gave my reasons for the way I exercised my discretion.

"[DEFENSE COUNSEL]:  Correct.  [¶]  . . .  [¶]  Well, I have 39 years on count 1.  Does that . . . conform with the Court?

"THE COURT:  Yes."

45

The court then confirmed that it had arrived at the 39-year figure, as follows: "[T]he Court impos[ed] a nine-year-high term, tripled, by virtue of the three-strike law, to 27 years. Plus an additional 10 for each of the 667(A) prior serious felonies, plus two, one-year enhancements for a prior prison term, *total 39*." (Italics added.) The court continued: "I've already expressed why I chose the terms that I did and why I made my decisions with respect to denial of probation and choosing aggravated terms [on count 1] and sentencing consecutively between counts 1 and 2." The court then repeated the calculations of the two prison terms, as follows:

> "So as to count 1, Penal Code section 264[.]1, rape in concert, total 27 years to life. [¶] Consecutive to that, state prison prior under 667(a), which w[as] found true, five years, that will . . . run consecutive to count 1; the second 667[(a)] prior found true, five years. That will run consecutive to the . . . first 667(a) prior and to count 1. [¶] There are two state prison priors under 667[.]5 sub[division] (b). [E]ach is one year consecutive to count 1, each consecutive to each other, each consecutive to the two 667(a) priors. *Total term for count 1 is 39 years to life*.

> "And I have already sentenced as to count 2. I'm not going to repeat that. [¶] But *for count 2, the total term of imprisonment is 17 years*. And that was all determinate time. All determinate time will [be] served first, followed by the indeterminate time. The . . . period of imprisonment may be followed by a period of parole to life." (Italics added.)

Finally, the court orally stated, "So combining the counts 1 and 2 and the applicable enhancements . . . , total commitment is 46 years to life."

From our detailed review of the record, the totality of the circumstances leads to only one conclusion: the trial court intended to sentence Velasquez to prison for a determinate term of 17 years on count 2 and an indeterminate term of 39 years to life on count 1; the court merely miscalculated the total years of commitment by incorrectly

46

adding 17 and 39 to reach 46 (instead of 56, which was much closer to the court's original estimate of "60 some years").

The court thoroughly and properly exercised its discretion, as required, in sentencing Velasquez on each count. Contrary to Velasquez's speculation, there is no indication or reason to suspect that the trial court's understanding of the total commitment — whether 46 or 56 years — influenced the exercise of the court's discretion in sentencing Velasquez on each of the individual counts. Indeed, Velasquez does not contend either (1) that the court abused its discretion or otherwise erred in sentencing him on either count, or (2) that an exercise of discretion or legal duty was triggered in the court's calculation of the total commitment.

Accordingly, Velasquez did not meet his burden of establishing reversible error entitling him to be resentenced.

DISPOSITION

The judgment is affirmed.

IRION, J.

WE CONCUR:

BENKE, Acting P. J.

O'ROURKE, J.

47